UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDLANDS DEFENSE; ALLIANCE FOR THE WILD ROCKIES; and NATIVE ECOSYSTEMS COUNCIL<br><br>    Plaintiff,<br><br>    v.<br><br>CECILIA SEESHOLTZ, in her official capacity as Boise National Forest Supervisor; TONY TOOKE, in his official capacity as Chief of the United States Forest Service; UNITED STATES FOREST SERVICE; and UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>    Defendants. | Case No. 1:17-cv-408-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion for a temporary restraining order filed by plaintiffs Wildlands Defense, Alliance for the Wild Rockies, and Native Ecosystems Council. The plaintiffs seek to enjoin two salvage logging projects in the Boise National Forest. Because some of the logging is scheduled to begin tomorrow, the Court must consider this motion on an extremely expedited basis with no oral argument and little time for reflection. Accordingly, this decision is entitled to a limited precedential value. For the reasons discussed below, the motion is denied.

**FACTUAL BACKGROUND**

In 2016, the Pioneer Fire burned over 190,000 acres in the Boise National Forest. Fueled by hot and dry conditions, the Pioneer Fire burned for more than four months, causing significant damage to an area frequently used for recreation. The blackened forest areas included an extensive network of backcountry yurts, trails for motorized and nonmotorized use, and a road system that connects to areas north such as Bear Valley and Deadwood Reservoir.

In September 2016, the Forest Service began working with interested parties to devise a restoration plan. In this collaborative effort, the Forest Service met with state, local, and tribal government officials, as well as groups representing timber, recreation, and environmental interests.

Importantly, the Boise Forest Coalition was involved with the Forest Service in the planning process. The Boise Forest Coalition is a group of environmentalists, timber interests, private citizens, and governmental officials. They make recommendations to the Forest Service based on a consensus of their members. Ultimately, the Boise Forest Coalition approved both projects at issue in this case.

The two projects are known as the North Pioneer Project and the South Pioneer Project. The project areas were separated based on the watershed basin: The North Pioneer Project will be conducted in a watershed that flows into the Payette River, while the South Pioneer Project will be conducted in a watershed that flows into the Boise

River. The two areas also have a different mix of recreational, social, and economic needs that warranted a separate analysis.

The Forest Service designed both projects to: (1) remove hazard trees that posed a risk of falling across roads and trails, and injuring the recreating public; (2) restore forest health, and specifically restore conifer species such as ponderosa pine; (3) improve watershed conditions by decommissioning unauthorized roads currently degrading watershed conditions, and (4) conduct salvage logging before the dead timber deteriorates and loses its economic value. The profit made from the salvage logging will allow the Forest Service to fund the first three purposes listed above.

In both projects, the Forest Service will log about 70 million board feet of dead trees and hazard trees. Hazard trees are those trees that are likely to fall across a road or public area, restrict transportation, or cause injury to the public or property. This salvage logging would occur on 7.8% of the area burned in the Pioneer Fire. About 65% of the logging in the North Pioneer Project involves the removal of hazard trees, and about 56% of the logging in the South Pioneer Project will involve the removal of hazard trees.

Both project areas contain Bull Trout and Canada Lynx, listed species under the Endangered Species Act (ESA), and contain their critical habitat. The Forest Service drafted a Biological Assessment (BA) concluding that neither project would adversely affect either species or their critical habitat. The Forest Service then requested that the Fish & Wildlife Service (FWS) review that determination, and the agency agreed to do so. On May 23, 2017, the FWS issued its determination concluding that "the Service

concurs with the Forest Service's finding that the two projects are not likely to adversely affect bull trout, bull trout critical habitat, and Canada Lynx." *See SP050188; NP041697.*

Two days later, on May 25, 2017, the Forest Service Regional Forester requested that the Forest Service Chief issue an Emergency Situation Determination (ESD) so that the two projects could begin immediately without waiting for the 90-day objection period. To issue an ESD, the Forest Chief must find that the immediate implementation of the project was necessary for "for relief from hazards threatening human health and safety" or to avoid "a loss of commodity value sufficient to jeopardize the agency's ability to accomplish project objectives directly related to resource protection or restoration." *See* 36 C.F.R. §§ 218.21(b).

Here, the Forest Chief found that both grounds applied: (1) The burned trees constituted a hazard to the public and to reforestation efforts, and (2) delay would result in deterioration of the trees, causing a loss in value of over $1 million and jeopardizing the reforestation plans contained in both Projects that would be funded by those revenues. *NP079084; SP079479.* The Forest Service Chief issued the ESDs on May 31, 2017.

On June 23, 2017, the Forest Service issued its Environmental Assessment for the North Pioneer Project, concluding that an Environmental Impact Statement (EIS) was not necessary because the project would not have a significant impact on the environment. The same decision was reached for the South Pioneer Project on July 10, 2017.

The salvage logging began in July of 2017. About 14 different timber sales were involved in the two projects. A few of those projects have been completed, while others are due to begin tomorrow.

## LEGAL STANDARDS

### Standard Under the Administrative Procedure Act

Plaintiffs' claims are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*. Under the APA, an agency action must be upheld unless it is found to be arbitrary or capricious. 5 U.S.C. § 706(2)(A). To decide if an agency action is arbitrary and capricious, the Court must determine whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made. *Pacific Coast Federation of Fishermen's Ass'ns, Inc. v. NMFS*, 265 F.3d 1028, 1034 (9th Cir.2001). Judicial review under this standard is to be "searching and careful," but remains "narrow," and a court should not substitute its judgment for that of the agency. *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir.1993).

### Standard for Temporary Restraining Order

The analysis required for a temporary restraining order and a preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001). The party seeking an injunction must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities/hardship tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def Council*,

555 U.S. 7, 20-23 (2008). "[S]erious questions on the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). This "sliding scale approach" allows a party to make a lesser showing of likelihood of success provided he will suffer substantial harm in the absence of relief. *Id.* at 1133. Under this approach, however, "serious questions going to the merits" requires more than showing that "success is more likely than not;" it requires a plaintiff to demonstrate a "substantial case for relief on the merits." *See Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011).

## ANALYSIS

### Likelihood of Success on the Merits -- ESA

Plaintiffs argue that the Forest Service made its decision to seek an ESD on the two projects before it received the FWS concurrence that the projects would not adversely affect the Bull Trout and Canada Lynx. The plaintiffs argue that this violates the ESA's mandate that agencies "shall not make any irreversible or irretrievable commitment of resources" during the consultation process. *See* 16 U.S.C. § 1536(d).

The record shows, however, that the Forest Service *did not* seek an ESD determination from the Forest Chief until two days *after* the FWS sent its concurrence letter, as fully discussed above. The Court cannot find that plaintiffs are likely to succeed on this issue.

**Likelihood of Success on the Merits – NFMA**

The National Forest Management Act (NFMA) requires that management activities within the National Forest must be consistent with Forest Plans. *See* 16 U.S.C. § 1604. Plaintiffs argue that the two projects will violate the soil conditions standards set forth in the Boise National Forest Plan. That Plan sets a standard for soil conditions affected by management activities like salvage logging:

> In an activity area where existing conditions of [soil] DD [detrimental disturbance] exceed 15 percent of the area, management activities shall include mitigation and restoration so that DD levels are moved back toward 15 percent or less following completion of the activities.

*NP22512.* Plaintiffs point to statements in the EAs of both projects stating that many units within the project areas will exceed 15% soil DD "immediately following salvage harvest activities."

The Forest Service discussed this issue at length in its EAs for both projects. For example, in the North Pioneer Project, the EA estimated that the fire resulted in soil DD exceeding 15% in 55 of the 57 harvest units. *NP88541.* For the South Pioneer Project, the fire resulted in soil DD exceeding 15% in 89 of the 93 harvest units. *SP52742-43.* The Forest Service then evaluated the impact of restoration and reclamation efforts contained in the two projects, and concluded that they would reduce the soil DD to under 15% in all the harvest units within the next 10 years. *NP88541; SP79947.* The 10-year time frame was used because the restoration efforts – restoring skid trails and roads used to

facilitate the salvage logging – would obviously continue for many years past the logging itself, which would be largely completed by 2018.

The EAs both concluded that this complies with the Boise National Forest Plan provision, quoted above, stating that "management activities shall include mitigation and restoration so that DD levels are moved back toward 15 percent or less *following completion of the activities*" (emphasis added). Applied here, the Forest Service interprets the Plan provision to mean that soil DD should be below 15% not when the salvage logging is completed, but when the extensive and long-term restoration efforts are completed.

Plaintiffs take issue with this interpretation of Forest Service regulations, but the agency's "interpretation and implementation of its own forest plan is entitled to substantial deference." *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836 (9th Cir. 2013). The Forest Service's reading of the Boise National Forest Plan provision at issue here is reasonable and entitled to substantial deference. The Court cannot conclude that plaintiffs are likely to succeed on this issue.

**Likelihood of Success on the Merits – NEPA**

The plaintiffs claim that they are likely to succeed on the issue whether the Forest Service violated NEPA by failing to prepare an EIS. It is unreasonable for the Forest Service to fail to prepare an EIS if "substantial questions exist" whether a proposed action "may have a significant effect on the environment." *N.R.D.C. v. Winter*, 502 F.3d

859, 867 (9th Cir.2007). The Forest Service must provide convincing reasons as to why the proposed timber sale will not have a significant impact on the environment. *Ctr. for Biological Diversity v. Nat. Highway Traffic Safety Comm'n*, 538 F.3d 1172, 1220 (9th Cir.2008). "The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Native Ecosystems Council v. Tidwell,* 599 F.3d 926, 937 (9th Cir.2010).

Whether a project's effects are significant "requires consideration of context and intensity." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008); see also 40 C.F.R. § 1508.27. Context refers to the scope of the agency action. *Id.* Intensity refers to the "severity of impact, which includes both beneficial and adverse impacts, the degree to which the proposed action affects public health or safety, the degree to which the effects on the quality of the human environment are likely to be highly controversial, the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks, and whether the action [involves] cumulatively significant impacts." *Id.* at 1185-1186.

In reviewing the decision not to prepare an EIS under the arbitrary and capricious standard, this Court must ask whether the agency has taken a "hard look" at the consequences of its proposed action, based its decision on consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant. *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1239 (9th Cir. 2005).

In examining the context element, it is important that the logging will take place in a relatively small area. The two projects will involve only 7.8% of the Pioneer Fire burn and only 0.67% of the Boise National Forest's total area.

Turning to the intensity element, the plaintiffs have argued that salvage logging does not generally promote forest health, and they cite several studies and expert reports backing that argument. But the Forest Service considered many of those same studies. For example, in the South Pioneer Project EA, the Forest Service evaluates the studies by Lindenmayer, Karr, and Beschta (also cited by plaintiffs) discussing the ecological effects of post-fire salvage logging in the Pacific Northwest. *SP079827*. The Forest Service came to a different conclusion about the effectiveness of salvage logging, primarily because these two projects are small, the potential hazards from falling trees are substantial, and the potential impacts are reduced through adoption of mitigation measures. "[A]n agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003).

The EAs contain lengthy discussions of the environmental impacts of the two projects. The Court cannot conclude that it is likely that plaintiffs will be successful in arguing that the Forest Service failed to take the required "hard look" at the two projects, as required by NEPA.

**Conclusion**

Because the Court cannot find that plaintiffs are likely to succeed on the merits, and cannot find that the plaintiffs have raised serious questions on the merits, the Court will deny the motion for TRO. The parties may contact the Court's Clerk, Jamie Bracke (Jamie_bracke@id.uscourts.gov) to schedule a hearing on the motion for preliminary injunction if necessary.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that plaintiff's Motion for Temporary Restraining Order (docket no. 4) is DENIED.

DATED: November 14, 2017

B. Lynn Winmill
Chief Judge
United States District Court