UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDLANDS DEFENSE; ALLIANCE FOR THE WILD ROCKIES; and NATIVE ECOSYSTEMS COUNCIL<br><br>    Plaintiff,<br><br>    v.<br><br>CECILIA SEESHOLTZ, in her official capacity as Boise National Forest Supervisor; TONY TOOKE, in his official capacity as Chief of the United States Forest Service; UNITED STATES FOREST SERVICE; and UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>    Defendants. | Case No. 1:17-cv-408-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion for preliminary injunction filed by plaintiffs Wildlands Defense, Alliance for the Wild Rockies, and Native Ecosystems Council. The plaintiffs seek to enjoin two salvage logging projects in the Boise National Forest. The Court heard oral argument on January 11, 2017, and took the motion under advisement. On February 2, 2018, plaintiffs sought leave to file a supplemental brief based on new information. Following briefing on that motion, the Court granted leave to file the supplemental brief. The defendants filed a response brief on April 10, 2018, and the

matter is now fully briefed. For the reasons explained below, the Court will deny the plaintiff's motion for a preliminary injunction.

## FACTUAL BACKGROUND

In 2016, the Pioneer Fire burned over 190,000 acres in the Boise National Forest. Fueled by hot and dry conditions, the Pioneer Fire burned for more than four months, causing significant damage to an area frequently used for recreation. The blackened forest areas included an extensive network of backcountry yurts, trails for motorized and nonmotorized use, and a road system that connects to areas north such as Bear Valley and Deadwood Reservoir.

In September 2016, the Forest Service began working with interested parties to devise a restoration plan. In this collaborative effort, the Forest Service met with state, local, and tribal government officials, as well as groups representing timber, recreation, and environmental interests.

Importantly, the Boise Forest Coalition was involved with the Forest Service in the planning process. The Boise Forest Coalition is a group of environmentalists, timber interests, private citizens, and governmental officials. They make recommendations to the Forest Service based on a consensus of their members. Ultimately, the Boise Forest Coalition approved both projects at issue in this case.

The two projects are known as the North Pioneer Project and the South Pioneer Project. The project areas were separated based on the watershed basin: The North Pioneer Project will be conducted in a watershed that flows into the Payette River, while

the South Pioneer Project will be conducted in a watershed that flows into the Boise River. The two areas also have a different mix of recreational, social, and economic needs that warranted a separate analysis.

The Forest Service designed both projects to: (1) remove hazard trees that posed a risk of falling across roads and trails, and injuring the recreating public; (2) restore forest health, and specifically restore conifer species such as ponderosa pine; (3) improve watershed conditions by decommissioning unauthorized roads currently degrading watershed conditions, and (4) conduct salvage logging before the dead timber deteriorates and loses its economic value. The profit made from the salvage logging will allow the Forest Service to fund the first three purposes listed above.

In both projects, the Forest Service will log about 70 million board feet of dead trees and hazard trees. Hazard trees are those trees that are likely to fall across a road or public area, restrict transportation, or cause injury to the public or property. This salvage logging would occur on 7.8% of the area burned in the Pioneer Fire. About 65% of the logging in the North Pioneer Project involves the removal of hazard trees, and about 56% of the logging in the South Pioneer Project will involve the removal of hazard trees.

Both project areas contain Bull Trout and Canada Lynx, listed species under the Endangered Species Act (ESA), and contain their critical habitat. The Forest Service drafted a Biological Assessment (BA) concluding that neither project would adversely affect either species or their critical habitat. The Forest Service then requested that the Fish & Wildlife Service (FWS) review that determination, and the agency agreed to do

so.  On May 23, 2017, the FWS issued its determination concluding that "the Service concurs with the Forest Service's finding that the two projects are not likely to adversely affect bull trout, bull trout critical habitat, and Canada Lynx."  *See SP050188; NP041697.*

Two days later, on May 25, 2017, the Forest Service Regional Forester requested that the Forest Service Chief issue an Emergency Situation Determination (ESD) so that the two projects could begin immediately without waiting for the 90-day objection period.  To issue an ESD, the Forest Chief must find that the immediate implementation of the project was necessary for "for relief from hazards threatening human health and safety" or to avoid "a loss of commodity value sufficient to jeopardize the agency's ability to accomplish project objectives directly related to resource protection or restoration." *See* 36 C.F.R. §§ 218.21(b).

Here, the Forest Chief found that both grounds applied: (1) The burned trees constituted a hazard to the public and to reforestation efforts, and (2) delay would result in deterioration of the trees, causing a loss in value of over $1 million and jeopardizing the reforestation plans contained in both Projects that would be funded by those revenues. *NP079084; SP079479.*  The Forest Service Chief issued the ESDs on May 31, 2017.

On June 23, 2017, the Forest Service issued its Environmental Assessment for the North Pioneer Project, concluding that an Environmental Impact Statement (EIS) was not necessary because the project would not have a significant impact on the environment. The same decision was reached for the South Pioneer Project on July 10, 2017.

The salvage logging began in July of 2017.  About 14 different timber sales were involved in the two projects.  About half of the logging projects have been completed, while others will likely begin when the winter snows recede.

**Programmatic Consultation**

As mentioned briefly above, the Forest Service has engaged in two consultations with the FWS:  The site-specific consultation discussed at length above and a programmatic consultation that is ongoing and expected to be completed in May of 2018.  In this latter consultation, the FWS is evaluating, at a programmatic level, the impact of Forest Plans on bull trout habitat across its entire range, a swath of territory including the Boise National Forest and 26 other National Forests.  More specifically, this programmatic consultation will evaluate the effects of the Boise National Forest's Plan on the 2010 revised critical habitat designation for the bull trout.

## LEGAL STANDARDS

**Standard Under the Administrative Procedure Act**

Plaintiffs' claims are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*.  Under the APA, an agency action must be upheld unless it is found to be arbitrary or capricious.  5 U.S.C. § 706(2)(A).  To decide if an agency action is arbitrary and capricious, the Court must determine whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made.  *Pacific Coast Federation of Fishermen's Ass'ns, Inc. v. NMFS*, 265 F.3d 1028, 1034 (9th Cir.2001).  Judicial review under this standard is to be "searching and

careful," but remains "narrow," and a court should not substitute its judgment for that of the agency. *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir.1993).

## Standard for Preliminary Injunction

The party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities/hardship tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def Council*, 555 U.S. 7, 20-23 (2008). Since *Winter* was decided, the Ninth Circuit has held that the "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011

## ANALYSIS

## Serious Questions on the Merits

In its earlier decision denying plaintiffs' motion for a temporary restraining order, the Court held that plaintiffs had not raised serious questions on the merits. *See Memorandum Decision, (Dkt. No. 27)* at p. 11. Since that decision was issued, the parties have filed nothing new. After further review, the Court finds that its prior analysis was sound.

The Court does find it necessary, however, to add some further analysis. The Pioneer Fire burned timber on steep slopes. The soil there is typical of the Idaho

Batholith – it is not cohesive and lacks the capacity to hold water.  In other words, the soil is highly susceptible to erosion.  When salvage logging removes the timber, sediment from the hillsides will flow into the creeks below unless protective measures are in place.

This is particularly important here because these creeks are home for the Bull Trout, a listed species.  Sediment is deadly for Bull Trout.  It increases water temperature, kills food sources, and destroys habitat, among other things.  These impacts are magnified because the creeks are already functioning at risk, meaning that they cannot absorb much sediment and still offer protective habitat for the Bull Trout.  Thus, protecting these riparian areas from sediment had to be a major priority for the Forest Service in approving these two logging projects.

To minimize sediment delivery, the Forest Service set up buffer zones – called Riparian Conservation Areas (RCAs) – within which activities such as road construction and logging were curtailed.  *AR NP042972-73* (discussing activities banned or limited in RCAs).  To determine how large these RCA buffer zones should be, the Forest Service used sediment modeling and monitoring data from previous post-fire salvage projects in the Boise National Forest.

The Forest Service was trying to predict, for the years following the logging, how much sediment would flow down those slopes and how far it would flow.  The agency would use those predictions to establish the RCAs to minimize sediment flow into the riparian areas.  Based on the models and the data from past fires, the Forest Service concluded that the buffer zones should be 120 feet for intermittent streams and 240 feet

for perennial streams.  *See SP049876.*  In addition, the Forest Service put significant limitations on activities *outside* the RCAs to ensure further protection.  *AR NP 042973-77.*

The plaintiffs take issue with the model used by the Forest Service, and argue that it underestimates the distance sediment would travel down the hillsides.  *See Declaration of Dr. Johnson (Dkt. No. 4-5)* at ¶ 22 (noting that the model itself states that it results "are not applicable in many mountainous areas where downhill sediment transport below forest roads is the result of mass erosion processes").  A model's accuracy is largely dependent on how closely it approximates the actual conditions on the ground under study.  Here, the Forest Service took extra steps to ensure the accuracy of the model's estimates.  First, the agency evaluated data showing sediment movement following a previous fire – known as the Foothills Fire – that burned in similar soils, topography, and vegetation.  *AR SP049875.*  In that fire, the model predicted that for one aspect of construction related to salvage logging, the sediment would move 352 feet, but it only moved 108 feet. Id.  For another aspect of the logging, the model predicted that the sediment would move 112 feet but it only moved 70 feet.  *Id.*

Thus, the model was overestimating actual sediment movement by a wide margin, giving the Forest Service confidence that its reliance on the conservative estimates of the model would sufficiently protect the riparian areas.  To further ensure accuracy, the Forest Service sent personnel into the field to verify the actual existence of vegetation

and other obstructions that could intercept sediment flows before they reach the creeks. *AR NP 042997-3000.*

When the Administrative Record is examined, it shows the Forest Service made substantial efforts to counter the potential for erosion. Not relying entirely on its own efforts, the Forest Service consulted with the Fish and Wildlife Service, which agreed that the protective measures were sufficient to protect the Bull Trout. *AR SP050185, NP 041694* (containing Fish & Wildlife Service conclusions that the two projects "may affect, but are not likely to adversely affect" Bull Trout and its critical habitat).

The Forest Service therefore went far beyond relying on a model to predict sediment movement. Instead, the agency tested the model's predictions against monitoring data from a previous fire in similar terrain, field-verified obstructions on the slopes that would slow sediment flow, and then obtained review and approval of the Fish and Wildlife Service for its protective measures. Under these circumstances, the Court cannot find that the plaintiffs have raised serious questions on their claims regarding threats to the Bull Trout from sediment movement.

The plaintiffs argue, however, that the logging must be halted because the Forest Service is engaged in an ongoing consultation with the FWS – the programmatic consultation. Section 7(d) of the ESA requires that "[a]fter initiation of consultation . . . the [Forest Service] shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which

would not violate subsection (a)(2) of this section." *See* 16 U.S.C. §1536(d). Logging is

generally held to be an "irreversible or irretrievable commitment of resources" because,

as plaintiffs point out, logged trees cannot be refitted to their stumps. *Pac. Rivers*

*Council v. Thomas*, 30 F.3d 1050, 1057 (9th Cir. 1994); *see also Lane County Audubon*

*Soc. v. Jamison,* 958 F.2d 290, 295 (9th Cir. 1992).

 Here, the programmatic consultation could result in changes to the Boise National

Forest Plan that would, under the cases cited above, typically require halting any logging

projects in the Boise National Forest until that consultation is complete. But there is a

unique circumstance present here that was absent in those cases: The FWS has evaluated

the site-specific impacts of the logging projects and concluded that they are "not likely to

adversely affect" the bull trout's critical habitat. As discussed above, the FWS's

conclusion is based on an in-depth evaluation of the predicted impacts of the projects.

 This FWS evaluation is a significant factor not present in the cases cited above. In

those cases, the ongoing consultation might have resulted in "reasonable and prudent

alternatives" that would be foreclosed if the logging took place. Here, that is not true.

The FWS did not base its conclusions on the projects' adherence to the Forest Plan – if

the agency had done so, there would be a legitimate basis for halting the logging because

the programmatic consultation might result in changes to the Plan, and any logging

should await those changes. But the FWS instead based its conclusions on the predicted

impacts of the two logging projects – the sediment delivery, the stream temperatures, the

drainage improvements – and that site-specific analysis will not be altered or even

addressed by the programmatic consultation. In the language of § 7(d), no "reasonable and prudent alternative measures" are being foreclosed by proceeding with the logging projects before the programmatic consultation is completed. Thus, the Court cannot find that the ongoing programmatic consultation requires halting the logging projects.

## Conclusion

Because the plaintiffs have not raised serious questions on the merits, the Court will deny their motion for preliminary injunction.[1]

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that plaintiff's Motion for Preliminary Injunction (docket no. 4) is DENIED.

IT IS FURTHER ORDERED, that the Government's motion to strike (docket no. 20) is deemed MOOT.

DATED: May 4, 2018

B. Lynn Winmill
Chief U.S. District Court Judge

---

[1] The Government has filed a motion to strike three declarations submitted by plaintiffs. Given the Court's denial of the plaintiffs' motion for preliminary injunction, the motion to strike is moot.